


FILED

Feb 27 2018, 2:26 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Indiana Supreme Court

Supreme Court Case No. 02S00-1511-DI-648

## In the Matter of
## Robert John Wray,
*Respondent.*

Decided: February 27, 2018

Attorney Discipline Action

Hearing Officer Christopher M. Goff

**Per Curiam Opinion**

Chief Justice Rush, Justice David, Justice Massa, and Justice Slaughter concur.
Justice Goff did not participate.

**Per Curiam.**

We find that Respondent, Robert John Wray, engaged in attorney misconduct arising from his solicitation of clients through a nonlawyer intermediary. For this misconduct, we conclude that Respondent should be suspended from the practice of law in this state for at least nine months without automatic reinstatement.

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Amended Verified Complaint for Disciplinary Action," and on the post-hearing briefing by the parties. Respondent's 1980 admission to this state's bar subjects him to this Court's disciplinary jurisdiction. *See* IND. CONST. art. 7, § 4.

# Procedural Background and Facts

The Commission filed a five-count "Verified Complaint for Disciplinary Action" on November 13, 2015, and later amended that complaint to add a sixth count. As set forth in more detail below, the amended complaint charged Respondent with a wide range of rule violations arising out of his professional relationship with Douglas Stephan, a nonlawyer. Following a hearing, the hearing officer filed a 64-page report finding Respondent committed violations as charged.

Respondent has represented several owners of allegedly defective modular or manufactured homes in actions against the homes' installers, builders, or manufacturers. One of those owners was Stephan, who purchased a home from Joseph Callaghan, d/b/a Fahl Manufactured Homes ("Callaghan"). Respondent and Stephan developed a relationship under which Stephan (through his company Stephan Consulting, Inc., which Respondent helped Stephan incorporate) would solicit other owners to become plaintiffs in Stephan's action and in other actions against Callaghan and other installers, builders, and manufacturers. Typically, Stephan would "cold call" the owners, offer to perform home inspections for them, and then ask those owners to sign an "Investor Agreement" and an "Attorney Agreement," both of which were drafted

and/or approved by Respondent and included Respondent's name throughout. The owners, and subsequently Respondent, would sign the Attorney Agreements, frequently without any direct communication with one another or discussion about the merits of the claim.

The Investor Agreements included statements falsely representing that the owners already had entered into fee agreements with Respondent. The Investor Agreements also included several statements that inaccurately described how litigation costs would be advanced and how the risks of litigation would be assumed. For example, the Investor Agreements stated Stephan would advance the costs of litigation in exchange for 50% of the client's net recovery, but aside from the first few cases Stephan did not actually advance these costs.[1] The Attorney Agreements provided that Respondent would receive a contingent fee of between 33% and 50%, and some Attorney Agreements also required a nonrefundable $1,000 retainer for costs.

Respondent entered into contracts with about 118 owners through his relationship with Stephan. One of these clients was David Lomperski, who – in exchange for a reduced contingent fee in his case – agreed to work with Stephan to identify other potential clients. Respondent helped draft an employment and noncompete agreement between Stephan and Lomperski.

The relationship between Respondent and Stephan eventually soured due to a dispute involving the advancement of costs, and Respondent proposed to Lomperski that they work together in the same capacity that Respondent had been working with Stephan. When they met to discuss this, Lomperski secretly recorded the conversation. Respondent also briefly entered into a similar relationship with David Blumenherst, who solicited at least two new clients using the same "Investor Agreement" template Respondent had provided Stephan.

---

[1] The hearing officer credited Stephan's testimony that he and Respondent eventually reached a verbal agreement that Respondent would front the litigation costs because Stephan was bringing in so many clients for him.

In addition to the misleading representations in the Investor Agreements regarding the advancement of litigation costs, after cases settled Respondent drafted a "Disbursement Authorization and Acknowledgement" form for his clients that in some instances inaccurately reflected the actual distributions and advancement of costs. After the accounting dispute arose between Respondent and Stephan, Respondent represented to clients that he had paid Stephan his share and instructed them not to pay Stephan, when in fact Respondent merely had "allocated" Stephan's share against the amount Respondent believed Stephan owed him.

The Investor Agreements provided that Stephan "shall take the lead in communications with the attorney" and others and purported to grant Stephan the authority to advance the client's claims and to "arrange for settlement." Notwithstanding this language, Respondent did have a general practice of writing his clients to notify them of significant events in their cases. However, Respondent admitted there often were delays of several months between the time that Stephan had clients execute Attorney Agreements and the time that Respondent eventually received those Agreements, and Respondent admitted further that he never raised the issue of these delays with Stephan. These delays could have led to claims being time-barred, although there is no evidence this occurred in any of the cases.

Several clients testified about what they felt was a lack of adequate communication or explanation from Respondent. Several clients also testified that they agreed to settle a claim against one defendant (Callaghan) based, at least in part, on Respondent's representation that they could recover additional amounts against another defendant (Chilton). However, Chilton would have been among the parties covered

by the release in the Callaghan settlement.[2]  The hearing officer found that Respondent misrepresented the viability of a potential claim against Chilton in order to motivate clients to settle claims against Callaghan.

During the Commission's investigation into the events described above, Respondent represented to the Commission that "Stephan Consulting did not 'solicit' clients for my law office. Stephan Consulting provided financing and consulting to various homeowners under separate and distinct agreements with homeowners." The hearing officer found this statement was false with respect to both solicitation and financing.

Finally, from 2008 through 2015, Respondent failed to keep adequate trust account records and separate ledgers for each client. Respondent also kept more than a nominal amount of personal funds in his trust account.

## Discussion

The Commission alleged, and the hearing officer concluded following an evidentiary hearing, that Respondent violated the following Indiana Rules of Professional Conduct:

> 1.4(a)(2):  Failing to reasonably consult with a client about the means by which the client's objectives are to be accomplished.

> 1.4(a)(3):  Failing to keep a client reasonably informed about the status of a matter.

---

[2] Respondent partially disputes this, arguing that he believed at the time there was a potential claim against Chilton that would survive the release. To make a long story short, Respondent's theory hinged upon whether the clients' homes were manufactured or modular. This was a fact that was readily ascertainable prior to the settlement with Callaghan; and indeed, Respondent advised clients just two weeks after their settlement with Callaghan that there was no viable action to be taken against Chilton.

1.4(a)(4): Failing to comply promptly with a client's reasonable requests for information.

1.5(a): Making an agreement for, charging, or collecting an unreasonable fee or amount for expenses.

1.15(a): Failing to maintain and preserve complete records of client trust account funds.

5.3(b): Failing to make reasonable efforts to ensure that the conduct of a nonlawyer employee over whom the lawyer has direct supervisory authority is compatible with the professional obligations of the lawyer.

5.3(c): Ordering or ratifying the misconduct of nonlawyer assistants, or failing to take reasonable remedial action with respect to the misconduct of nonlawyer assistants under the lawyer's supervision.

5.4(a): Improperly sharing legal fees with a nonlawyer.

7.3(a): Improperly soliciting employment in-person, by phone, or by real time electronic contact from a person with whom the lawyer has no prior relationship when a significant motive is the lawyer's pecuniary gain.

7.3(e): Improperly giving something of value for a recommendation for employment.

7.3(f): Accepting employment when the lawyer knows, or reasonably should know, that the person seeking the lawyer's services does so as a result of lawyer conduct prohibited under Rule 7.3.

8.1(a): Knowingly making a false statement of material fact to the Disciplinary Commission in connection with a disciplinary matter.

8.4(a): Violating the Rules of Professional Conduct through the acts of another.

8.4(c): Engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.

The Commission also alleged, and the hearing officer concluded, that Respondent violated the following Indiana Admission and Discipline Rules:[3]

23(29)(a)(2): Failing to create, maintain, or retain appropriate trust account records.

23(29)(a)(3): Failing to maintain a ledger with separate records for each client with funds deposited in a trust account.

Respondent has petitioned this Court to review the hearing officer's findings and conclusions. In his petition, Respondent admits the trust account violations but disputes the other charges. The Commission carries the burden of proof to demonstrate attorney misconduct by clear and convincing evidence. *See* Ind. Admission and Discipline Rule 23(14)(g)(1). We review de novo all matters presented to the Court, including review not only of the hearing officer's report but also of the entire record. *See Matter of Wall*, 73 N.E.3d 170, 172 (Ind. 2017). While this Court reserves the right to make the ultimate determination, the hearing officer's findings receive emphasis due to the unique opportunity for direct observation of witnesses. *Id.*

---

[3] Admission and Discipline Rule 23 was amended effective January 1, 2017. The citations herein are to the version of Rule 23(29) in effect at the time of Respondent's misconduct.

The overarching issue in this case involves the nature of Respondent's relationship with Stephan. Respondent has contended throughout these proceedings that Stephan acted independently and that Respondent merely accepted referrals from him. The Commission has contended that Stephan was acting as Respondent's agent. The hearing officer acknowledged conflicting evidence on this point but ultimately concluded the Commission had proven the existence of an agency relationship. Upon review of the materials before us, we agree with the hearing officer.

In his petition for review, Respondent strenuously attacks Stephan's credibility. Indeed, the hearing officer in his report expressly questioned the credibility of both Stephan and Respondent, but ultimately found key portions of Stephan's testimony corroborated by independent evidence and logical inferences. This type of credibility determination was within the hearing officer's purview to make, and we find ample support for his findings in this case. Respondent helped Stephan incorporate Stephan Consulting, the business Stephan used to recruit other potential plaintiffs. The Investor Agreements and Attorney Agreements used by Stephan (and later by Blumenherst) were drafted and/or approved by Respondent and contained his name throughout. Stephan performed the client intake and, as the Agreements expressly contemplated, served as the primary point of contact for the clients. Respondent later drafted an employment and noncompete agreement between Stephan and Lomperski, who assisted Stephan in identifying potential plaintiffs. When Respondent's relationship with Stephan soured, Respondent attempted to persuade Lomperski to take Stephan's place in the recruitment scheme and discussed (in a conversation secretly recorded by Lomperski) the need for Lomperski to get out of the noncompete agreement Respondent had drafted. In sum, this was not merely a referral system, and Respondent's role in the client recruitment process was anything but passive. We find the evidence clearly and convincingly establishes an agency relationship between Respondent and Stephan. *See* Restatement (Third) of Agency §§ 1.01, 1.03 (2006).

As the issues have been framed in this case, many of the rule violations found by the hearing officer consequently follow from the finding of an agency relationship between Respondent and Stephan. *See, e.g.,* Rules

7.3(a) (barring solicitation by a lawyer or the lawyer's employee or agent) and 8.4(a) (addressing violation of professional conduct rules through the acts of another). Respondent's remaining challenges to the hearing officer's findings and conclusions are not persuasive. With respect to the Rule 1.4 charges, Respondent attacks the credibility of those clients who testified to a lack of adequate communication or explanation from Respondent, and he points to the existence of some written correspondence between himself and those clients. Similar to Stephan's testimony though, the hearing officer found the clients' testimony largely corroborated by independent evidence and logical inferences, and we find ample support for the hearing officer's findings and reasoning.

With respect to the Rule 8.1(a) and 8.4(c) charges, Respondent contends he was not dishonest or deceitful with either his clients or with the Commission. For example, Respondent asserts there is little material difference between Stephan being "paid" and having funds "allocated" against Stephan's alleged debt to Respondent, but under the circumstances there plainly was a difference. Stephan disputed the alleged debt, and if Respondent did not pay him, Stephan presumably could seek payment from the clients (which likely is why the clients were seeking clarification and confirmation of payment from Respondent). And while Respondent argues that the solicitation component of his statement to the Commission was simply a good-faith defense to the matters being investigated by the Commission, he makes no argument about the financing component of his statement, which was objectively false. Notwithstanding the plain language (and asserted purpose) of the Investor Agreements, Stephan was not providing financing to the homeowners, and Respondent testified he knew Stephan was not advancing these funds and that Respondent was paying these costs out of his own trust account instead.

Finally, Respondent advances an alternative argument with respect to Rule 7.3. Respondent argues that even if Stephan was soliciting clients as Respondent's agent, and even though Rule 7.3(a) generally prohibits such solicitation, Rule 7.3(b)(3) provides a "safe harbor" in this case. Respondent is mistaken. Rule 7.3(b)(3) by its express terms addresses solicitation that "concerns an action for personal injury or wrongful death

or otherwise relates to an accident or disaster . . . ." Allegedly defective workmanship in a manufactured or modular home, standing alone, is not the type of injury encompassed by this rule. And while Respondent advances a colorable policy argument in favor of expanding the scope of permitted solicitation under Rule 7.3, an attorney has the obligation to conform his practices to the applicable professional conduct rules as written, not whatever alternative rules the attorney believes would be better.

In sum, we find sufficient support for the hearing officer's findings and conclusions with regard to each of the charged rule violations. Accordingly, we find Respondent violated Professional Conduct Rules 1.4(a)(2), 1.4(a)(3), 1.4(a)(4), 1.5(a), 1.15(a), 5.3(b), 5.3(c), 5.4(a), 7.3(a), 7.3(e), 7.3(f), 8.1(a), 8.4(a), 8.4(c), and Admission and Discipline Rules 23(29)(a)(2) and 23(29)(a)(3). We turn now to the question of sanction.

Respondent's arrangement with Stephan shares some similarities with the type of business model we have confronted in disciplinary cases involving attorneys' association with corporations marketing "foreclosure assistance" or "debt relief" services to consumers. *See, e.g., Matter of Mossler,* 86 N.E.3d 387 (Ind. 2017); *Matter of Dilk,* 2 N.E.3d 1263 (Ind. 2014). To be sure, there are important distinctions. Respondent had much more substantive involvement in his clients' cases than did the attorneys in cases such as *Mossler* and *Dilk*, whose marginal roles in the business schemes at issue amounted to little more than creating the illusion of meaningful attorney involvement. Further, unlike the largely worthless services sold by the debt relief companies to consumers in those cases, Respondent's services provided some value for his clients, many of whom obtained recoveries they might not otherwise have obtained.

Nonetheless, the actual and potential harm resulting from this type of arrangement is readily apparent. In this case, Respondent's delegation of client intake responsibilities to Stephan led to impermissible solicitation of clients, misrepresentations to clients about financing and costs, and delays of several months before Respondent became involved with (or even aware of) the clients' cases. Clients, whose primary point of contact was Stephan, encountered difficulty communicating with Respondent and

remaining sufficiently apprised about their cases. Although many clients did obtain some recovery, those recoveries were greatly reduced due to a second contingent fee owed to Stephan, a middleman who was not actually providing the financing services clients were paying him to provide. And when a financial dispute arose between Respondent and Stephan, clients were caught in the middle.

Throughout all of this, Respondent lied. Respondent provided Stephan with Investor Agreements for clients to execute that Respondent knew were false in several material respects. Respondent falsely told several clients at the conclusion of their cases that Respondent already had paid Stephan. And when the Commission began investigating Respondent's practices, Respondent falsely told the Commission that Stephan provided financing for clients, when Respondent knew Stephan was not doing so. Respondent's pattern of dishonesty elevates his problematic arrangement with Stephan into a much more serious offense. *See Matter of Ellison*, 87 N.E.3d 460, 462 (Ind. 2017).

Nor is this Respondent's first encounter with the disciplinary process. Respondent and two other attorneys were publicly reprimanded by this Court in 2009 for deceptive advertising and improper use of a trade name. *Matter of Loomis, Grubbs and Wray*, 905 N.E.2d 406 (Ind. 2009). Notably, Respondent undertook his unethical arrangement with Stephan around the same time he was being disciplined for a prior unethical scheme to attract clients. One would have hoped our reprimand would have prompted Respondent to consider his ethical obligations and business practices more carefully. *See Matter of Powell*, 76 N.E.3d 130, 135 (Ind. 2017) ("[I]n many instances an attorney will be chastened by discipline for a first offense, adequately remedy his or her professional shortcomings, and be unlikely to recidivate going forward"). Instead, Respondent continued his enterprise with Stephan for several years and then sought to pursue similar client solicitation arrangements with other middlemen. Under these circumstances, Respondent's prior discipline is a significant aggravating factor.

After careful consideration of this matter, we conclude that Respondent should be suspended for a period of at least nine months, after which he

may be reinstated only after proving by clear and convincing evidence his remorse, rehabilitation, and fitness to practice. *See* Admis. Disc. R. 23(18)(b).

# Conclusion

For Respondent's professional misconduct, the Court suspends Respondent from the practice of law in this state for a period of not less than nine months, without automatic reinstatement, effective April 9, 2018. Respondent shall fulfill all the duties of a suspended attorney under Admission and Discipline Rule 23(26). At the conclusion of the minimum period of suspension, Respondent may petition this Court for reinstatement to the practice of law in this state, provided Respondent pays the costs of this proceeding, fulfills the duties of a suspended attorney, and satisfies the requirements for reinstatement of Admission and Discipline Rule 23(18).

The costs of this proceeding are assessed against Respondent. The hearing officer appointed in this case is discharged.

Rush, C.J., and David, Massa, and Slaughter, JJ., concur.
Goff, J., did not participate.

ATTORNEYS FOR RESPONDENT

James P. Fenton
Daniel G. McNamara
Fort Wayne, Indiana

ATTORNEYS FOR INDIANA SUPREME COURT
DISCIPLINARY COMMISSION

G. Michael Witte, Executive Director
Rachel B. Gallagher, Staff Attorney
Indianapolis, Indiana