

IN THE

# Indiana Supreme Court

Supreme Court Case No. 24S-DI-438

# In the Matter of Robert James Hardy Jr.,
*Respondent.*



FILED

Jun 23 2026, 1:33 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Decided: June 23, 2026

Attorney Discipline Action

Hearing Officer Robert C. Reiling

**Opinion by Chief Justice Rush**

Justices Massa, Slaughter, and Molter concur.
Justice Goff concurs in part and dissents in part.

**Rush, Chief Justice.**

Practicing law in Indiana is a privilege. With that privilege comes the duty to "behave at all times in a manner consistent with the trust and confidence" this Court places in those admitted to the bar. Ind. Admission and Discipline Rule 23(1)(a). Professional Conduct Rule 8.4(g) enforces that duty in one important respect: it prohibits a lawyer, when acting "in a professional capacity," from engaging in conduct that manifests bias or prejudice based on personal characteristics, including race, gender, disability, or socioeconomic status. This attorney-discipline case requires us to clarify the scope of the rule's professional-capacity element.

While serving as DeKalb County's chief deputy prosecutor during 2023, Robert James Hardy Jr. repeatedly made unfounded accusations that a judge and a local attorney were having a sexual relationship, claimed that the judge favored the attorney in court, and made disparaging remarks about various groups of people. A hearing officer found that Hardy violated two professional conduct rules, but not Rule 8.4(g), and recommended a suspension of at least thirty days with automatic reinstatement. The Disciplinary Commission petitioned for review, asking us to find that he violated Rule 8.4(g) and to increase the sanction.

We agree on both points. In doing so, we emphasize two important limitations: Rule 8.4(g) does not reach purely private expression or lawful participation in public debate; and this Court is not the speech police. But when lawyers speak or act in a professional capacity, they assume obligations that require restraint. Enforcing Rule 8.4(g) within those limits helps maintain public confidence in the impartiality of our legal system and trust in the legal profession. We clarify the rule today and then enforce it, concluding that the Commission proved by clear and convincing evidence that Hardy violated Rule 8.4(g). We then hold that those violations, together with his two other violations, warrant a suspension of 180 days with automatic reinstatement.

# Facts and Procedural History[1]

Robert James Hardy Jr. was admitted to practice law in Indiana in 1996. Over the next three decades, he served in several legal roles in northeast Indiana, including in private practice, as a public defender, as a chief public defender, and twice as a chief deputy prosecutor.

Around 2008, Hardy and now-Judge Adam Squiller formed a law firm in DeKalb County. About four years later, they brought on Stephanie Hamilton—who had already spent most of her career working for Hardy—as an associate attorney. Hardy left the firm in 2014 to serve as the county's chief deputy prosecutor. Hamilton was then named partner and remained with the firm until Squiller was elected judge of DeKalb Superior Court 1 in 2020. Hamilton then opened her own firm in the county, focusing primarily on family law, criminal defense, and estate planning. Hardy also remained active in the local legal community; after his initial tenure as chief deputy prosecutor, he returned to private practice, where he remained until the end of 2022.

Throughout these years, Hardy, Hamilton, and Judge Squiller were not only colleagues but also friends who occasionally socialized together. Hamilton described Hardy as prone to making "provocative statements," and Judge Squiller similarly characterized him as "an individual who likes to rant." For example, at a dinner party at Hamilton's house sometime after 2010, Hardy said that "Romani people should be killed" and "referred to them as gypsies."[2] Judge Squiller heard Hardy make similar comments "multiple times" during their years working together. He also heard Hardy say that he hated "poor people"; that people with autism

---

[1] At the outset, we acknowledge Hardy's threshold position that he did not make many of the statements at issue. But the hearing officer explicitly found that Hardy made the statements underlying two rule violations and identified several statements relevant to Rule 8.4(g). Those findings necessarily credit the Commission's witnesses. And from our de novo review of the record, we find no reason to disturb that implicit credibility determination. *See, e.g.*, *In re Wray*, 91 N.E.3d 578, 582 (Ind. 2018) (per curiam). We thus recount the facts accordingly.

[2] We reproduce this and other appalling statements throughout this opinion to give an accurate and uncensored account of the facts.

should be "drowned in the river and killed because they are a drain on society and provide no benefit"; that Native Americans "serve no purpose and . . . should be exterminated"; and that attractive women and defendants with private counsel should receive more favorable plea offers. Despite these comments, Hardy's relationships with Hamilton and Judge Squiller remained cordial.

But that all changed in 2023 when Hardy served for the second time as chief deputy prosecutor in DeKalb County. Over an eleven-month period, Hardy made repeated accusations and remarks during the workday—including in judges' chambers, the courthouse, and the prosecutor's office—that strained professional relationships, damaged reputations, and undermined confidence in the local legal system.

It began with Hardy repeatedly accusing Hamilton and Judge Squiller of having an inappropriate sexual relationship and asserting that Judge Squiller favored Hamilton in court, though he had no factual basis for either allegation. In early March, Hardy told DeKalb Superior Court 2 Judge Monte Brown in his chambers that Judge Squiller and Hamilton were involved in "an inappropriate relationship." When Judge Brown asked for the basis for the accusation, Hardy simply responded, "it's all true." Hardy repeated similar allegations to the county's chief public defender, Mark Olivero, when the two would "get together to talk about cases." On one occasion, Hardy asked Olivero, "[I]s there any doubt that they are not fucking[?]" Hardy also told Olivero "a number of times" that Hamilton received "favorable results in front of Judge Squiller." And Hardy made the same accusations to Deputy Prosecutor Schuylar Casto, whom he supervised and who was the only other full-time attorney in the office. Hardy once told Casto that Hamilton could "get whatever she wants because she's fucking the Judge" and made "similar type statements multiple times."

Hardy also claimed Hamilton had a sexual relationship with a criminal defendant she represented. Hamilton had known the defendant from other contexts, and he later became a candidate for the county's drug court program. When that happened, Hardy approached Judge Squiller and stated that Hamilton "had a sexual relationship" with the defendant,

that it was inappropriate for her to try to get him into the program, and that he should not be admitted because of the purported conflict. Hardy again offered no factual support for the claim. Still, Judge Squiller addressed the allegation with Hamilton and "moved on" after she confirmed it wasn't true.

Aside from the personal attacks, Hardy also made many remarks about groups of people and differential treatment in the legal system, often echoing views he had expressed in previous years to Hamilton and Judge Squiller. He frequently reiterated his hatred of "poor people" to Judge Squiller. In that same vein, Hardy told Judge Squiller and Casto that "people who hire private counsel should receive better plea proposals than those who are represented by the public defender." He also made what Casto described as "a fairly joking statement" about giving better plea deals to attractive women. And he made dehumanizing remarks about people with autism and disabilities, telling Casto that they "should be drowned in the river" and telling Judge Brown that they "should be put down."

Hardy made race- and national-origin-based comments too. He told Casto that "Romani people are gypsies and should all be killed"; Native Americans "should have been wiped from the earth a while ago . . . because they never learned to invent the wheel"; Black people had gone "downhill from" the time Malcolm X and Martin Luther King Jr. were alive; and Black people "were not doing well in society because they did not speak properly or speak well enough" and would be better off "if they spoke more like White people." He also told Casto, apparently in a joking manner, that the appropriate punishment for a Burmese defendant the office was prosecuting would be "just to beat him," rather than send him to prison, "because that's what he expected anyway." And Olivero recalled that, when he represented Hispanic clients, Hardy would say something "derogatory about the Hispanics or something along those lines," though Olivero could not recall any specific remark.

Hardy's comments also targeted women, including members of the local legal community. Early in 2023, Judge Brown decided not to seek re-election, and three people expressed interest in the position, including

Hamilton and another woman. During the same conversation in Judge Brown's chambers in which Hardy falsely accused Judge Squiller and Hamilton of having an inappropriate relationship, Hardy pointed to the chair the judge was sitting in and said, "[N]o woman should ever sit in that chair." He then went further, saying that "no woman should ever be Judge of the DeKalb Superior Court II, or any Court" and that women are "crazy one week a month and only marginally able to practice the other three." Around the same time, Hardy likewise told Judge Squiller that "[n]o woman should be Judge in DeKalb County."

Hardy's remarks about women extended beyond who should hold judicial office. He suggested to Hamilton that "women shouldn't go after men for child support because they can just have an abortion." And in front of Casto and Casto's wife, who was also a deputy prosecutor, Hardy said it would be "the woman's fault" if someone took an upskirt photo of her. This comment made Casto's wife so uncomfortable that "she changed her dress because of it."

Hardy's conduct throughout 2023 had immediate consequences within the local legal community. Because of his "noxious" remarks in Judge Brown's chambers, the county's three judges collectively decided that Hardy could no longer stop by their chambers for one-on-one conversations, which was a common practice among local attorneys. The judges believed the restriction was necessary to protect themselves "from being part of conversations where unfounded accusations and improper statements were being made."

Hardy's unfounded accusations about Hamilton and Judge Squiller harmed Hamilton's reputation, led to uncomfortable conversations with clients and her children, and caused her to limit social engagements with colleagues and the local bar association. The comments also affected Judge Squiller's reputation and the public's perception of the justice system. Multiple defendants incarcerated in the county jail asked him if "there was an improper relationship." And, in his view, Hardy's conduct adversely affected "the reputation of the Courts in DeKalb County and the legal system by causing people to question whether things are handled in this county with integrity."

These concerns culminated in December 2023 when Hardy's actions led to the dismissal of a criminal case. Two days before trial was scheduled to begin in Judge Squiller's courtroom for a defendant Hamilton represented, Hardy called the defendant's then-wife to discuss her upcoming testimony. During a nearly hour-long conversation, Hardy said Hamilton was "acting like a childish bitch," accused Judge Squiller of being biased in Hamilton's favor, and discussed the different consequences her husband could expect if he pleaded guilty. Hamilton moved to dismiss the case for prosecutorial misconduct, and Judge Squiller granted the motion.

After investigating these events, the Disciplinary Commission filed a verified complaint alleging that Hardy violated three Rules of Professional Conduct.

- Rule 4.4(a) prohibits a lawyer, in representing a client, from using "means that have no substantial purpose other than to embarrass, delay, or burden a third person."
- Rule 8.2(a) prohibits a lawyer from making "a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge."
- Rule 8.4(g) makes it "professional misconduct for a lawyer to . . . engage in conduct, in a professional capacity, manifesting, by words or conduct, bias or prejudice based upon race, gender, religion, national origin, disability, sexual orientation, age, socioeconomic status, or similar factors," with an exception for "[l]egitimate advocacy respecting the foregoing factors."

The matter proceeded to an evidentiary hearing in August 2025. The Commission presented six witnesses—Hamilton, Judge Squiller, the criminal defendant's former wife, Judge Brown, Olivero, and Casto—and introduced ten exhibits into evidence.

Hardy then called two witnesses and testified on his own behalf. His best friend explained that Hardy would sometimes take positions he did not personally hold to provoke debate. That friend, who had a daughter with autism, also explained that Hardy sometimes had "a dark sense of humor" and would "jokingly" talk about how autistic people "could be

dealt with," such as by putting the friend's daughter "in a sack and throw[ing] her in the pond" to "alleviate" the challenges she presented at home. A former Steuben County magistrate described Hardy as a sarcastic, intellectually provocative "smart aleck" who "says things to challenge people." Finally, Hardy denied making nearly every statement the Commission's witnesses attributed to him. When he acknowledged having certain conversations, he characterized his remarks as jokes, philosophical provocations, or comments taken out of context.

About two months later, the hearing officer issued his report. He concluded that Hardy violated Rules 4.4(a) and 8.2(a) based on his unfounded allegations about Hamilton and Judge Squiller, his related accusations of bias against Judge Squiller, and his phone conversation with the former wife of Hamilton's client. But the hearing officer determined that Hardy did not violate Rule 8.4(g), concluding his "statements and conduct were boorish and may have been inappropriate" but that they "fell within the scope of free expression under the First Amendment and did not impact the administration of justice." The hearing officer recommended a suspension of no less than thirty days with automatic reinstatement.

The Commission petitioned for review, the parties filed responsive briefs, and the matter is now ripe for our consideration.

## Discussion and Decision

This disciplinary case requires us to decide two issues. We must first determine whether the Commission proved that Hardy violated Rule 8.4(g). We then decide the appropriate sanction for all proven misconduct.

Because the alleged misconduct occurred while Hardy served as a chief deputy prosecutor, these issues arise against an important institutional backdrop: prosecutors have "the capacity to bolster or damage public esteem for the system different than that of attorneys otherwise in practice." *In re Hill*, 144 N.E.3d 184, 193 (Ind. 2020) (per curiam) (quoting *In re Oliver*, 493 N.E.2d 1237, 1242 (Ind. 1986) (per curiam)). We review the full record de novo but give due weight to the hearing officer's findings

given his unique opportunity to observe the witnesses firsthand. *See, e.g.*, *id.* at 188. And we remain mindful that the Commission bears the burden of proving misconduct by clear and convincing evidence. Admis. Disc. R. 23(14)(g)(1).

Before turning to Rule 8.4(g), we briefly address the hearing officer's conclusion that Hardy violated Rules 4.4(a) and 8.2(a). Although Hardy has not petitioned for review of those conclusions, he reiterates his disagreement in responding to the Commission's petition. Our de novo review reveals ample support for both violations. While representing the State, Hardy used means that had no substantial purpose other than to embarrass or burden Hamilton, in violation of Rule 4.4(a). And he made reckless, unfounded accusations impugning Judge Squiller's integrity, in violation of Rule 8.2(a).

That leaves Rule 8.4(g), which makes it professional misconduct for a lawyer to "engage in conduct, in a professional capacity, manifesting, by words or conduct, bias or prejudice based upon race, gender, religion, national origin, disability, sexual orientation, age, socioeconomic status, or similar factors," with an exception for "[l]egitimate advocacy respecting the foregoing factors." The professional-capacity element, which is our focus today, is an important limitation. It prevents the rule from reaching purely private expression or every biased or prejudicial remark a lawyer may make. At the same time, lawyers who act in a professional capacity assume duties that may require them to refrain from speech that would otherwise be protected outside that capacity. *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1071 (1991).

The parties agree, as do we, that the relevant inquiry under Rule 8.4(g)'s plain text is whether Hardy's challenged conduct occurred "in a professional capacity," rather than—as the hearing officer framed it— whether it "impact[ed] the administration of justice." We have not yet squarely addressed the scope of this element, and the parties dispute how it applies here. The Commission maintains that Hardy acted in a professional capacity because he made remarks manifesting bias or prejudice "in the course of a normal workday in communication with colleagues, judges, and opposing counsel." Hardy responds that nearly all

his statements were not made in a professional capacity because they were unrelated to any pending case or legal task. Both positions miss the mark. The Commission's position gives too much weight to setting and audience; Hardy's gives too little weight to professional role and authority.

Ultimately, for reasons explained in detail below, we conclude that a lawyer acts "in a professional capacity" under Rule 8.4(g) when, viewed objectively and in context, the challenged conduct bears a substantial connection to the lawyer's practice of law or professional role in the legal system. That connection is ordinarily present when the lawyer performs or purports to perform a legal function, such as advocating, advising, negotiating, communicating as counsel, interacting with witnesses, supervising legal work, or exercising legal authority. But the connection may also exist outside a discrete legal task if the lawyer's professional role materially gives the challenged conduct its setting, audience, subject, or practical force. The inquiry in this context is functional, not status- or venue-based. Accordingly, a lawyer's title, workplace, or audience may be relevant, but none alone ordinarily establishes that the lawyer acted in a professional capacity.

Applying these principles, we hold the Commission proved by clear and convincing evidence that Hardy committed multiple violations of Rule 8.4(g). We then hold that those violations, together with Hardy's violations of Rules 4.4(a) and 8.2(a), warrant a suspension of 180 days with automatic reinstatement.

## I. Hardy violated Rule 8.4(g) by making statements manifesting bias or prejudice while acting in a professional capacity.

To determine whether the Commission proved by clear and convincing evidence that Hardy violated Rule 8.4(g), we begin by clarifying the scope of the phrase "in a professional capacity." After examining the rule, our precedent, and persuasive authority from other jurisdictions, we conclude that this element requires a substantial connection, assessed objectively

and in context, between the challenged conduct and the lawyer's practice of law or professional role in the legal system. We then apply that standard and conclude that several of Hardy's statements had the requisite connection and manifested bias or prejudice based on race, gender, disability, or socioeconomic status.

## A. The professional-capacity element requires a substantial connection, assessed objectively and in context, between the challenged conduct and the lawyer's practice of law or professional role in the legal system.

Since 2002, Rule 8.4(g) has prohibited lawyers from engaging in conduct that manifests bias or prejudice when acting "in a professional capacity." Most jurisdictions impose similar prohibitions, but their wording and scope vary widely. *See, e.g.*, CPR Pol'y Implementation Comm., Am. Bar Ass'n, *Variations of the ABA Model Rules of Professional Conduct, Rule 8.4: Misconduct* (June 2024). To that point, only three other jurisdictions use the same "professional capacity" phrasing in their analogous rules. *See* Md. Rule 19-308.4(e); N.J. RPC 8.4(g); Ohio Prof. Cond. R. 8.4(g).

Rule 8.4(g) is the only provision in our professional conduct rules that uses the phrase "professional capacity," and neither the rule nor its commentary defines the phrase. It is thus not surprising that members of the bar have long sought clarification on the element's scope. *See* Donald R. Lundberg, *Of Telephonic Homophobia & Pigeon-Hunting Misogyny: Some Thoughts on Lawyer Speech*, 53 Res Gestae 22, 22 (June 2010); ISBA Legal Ethics Committee, *Participation in Discriminatory Organizations—The Scope of Rule 8.4(g)*, 58 Res Gestae 25, 29 (Apr. 2015). We provide that clarification today, while recognizing that an exhaustive definition is neither possible nor necessary.

Our precedent is the starting point. We have addressed Rule 8.4(g) in eight disciplinary decisions, seven of which found a violation. Together, these cases show that "in a professional capacity" is broader than "while

representing a client" but narrower than "while being a lawyer." They reveal that the phrase requires a substantial connection, assessed objectively and in context, between the challenged conduct and the lawyer's practice of law or professional role in the legal system.

The connection is most apparent when a lawyer performs or purports to perform a legal function, such as advocating, advising, negotiating, communicating as counsel, interacting with witnesses, supervising legal work, or exercising legal authority. Thus, lawyers have acted in a professional capacity when they made biased or prejudicial remarks while representing a client in pleadings, in court, or in professional communications. *In re Thomsen*, 837 N.E.2d 1011, 1011–12 (Ind. 2005) (per curiam); *In re Campiti*, 937 N.E.2d 340, 340 (Ind. 2009); *In re McCarthy*, 938 N.E.2d 698, 698 (Ind. 2010); *In re Barker*, 993 N.E.2d 1138, 1139 (Ind. 2013). The same was true in *Kelley*, where a lawyer identified her husband as her client during a phone call with a company representative before "gratuitously" asking whether the representative was "gay" or "sweet." *In re Kelley*, 925 N.E.2d 1279, 1279 (Ind. 2010). And *Epstein* reflects the same principle because the lawyer spoke "in pejorative terms about another client's race" during recorded conversations with a criminal defendant he represented. *In re Epstein*, 87 N.E.3d 470, 470 (Ind. 2017).

Professional-capacity conduct, however, is not limited to a discrete legal task. The requisite connection may also exist when the lawyer's professional role gives the challenged conduct legal-system significance. *Dempsey* illustrates this point. There, after bankruptcy and foreclosure litigation had concluded, a lawyer distributed flyers that referred to the opposing parties as "slumlords," described their attorneys as "'bloodsucking shylocks' who were part of a 'heavily Jewish (sic) . . . reorganization cartel,' and made free-ranging disparaging remarks about Jews generally." *In re Dempsey*, 986 N.E.2d 816, 816 (Ind. 2013). The lawyer then continued similar conduct during the resulting disciplinary proceedings. *Id.* In finding a Rule 8.4(g) violation, we emphasized that the lawyer's conduct arose from legal proceedings, targeted opposing counsel, and "included repeated abuse of the tools of the legal system itself." *Id.* at 817.

*Usher* is consistent. In that case, a lawyer used professional relationships formed through his legal practice to distribute a fabricated email intended to damage a younger attorney who had rebuffed his romantic advances. *In re Usher*, 987 N.E.2d 1080, 1083–85 (Ind. 2013) (per curiam). We rejected the lawyer's argument "that his actions regarding the email were not done in a professional capacity." *Id.* at 1086–87. But we declined to find a Rule 8.4(g) violation because the Commission failed to prove the conduct was motivated by gender bias rather than by personal anger at one woman in particular. *Id.* at 1089. Together, *Dempsey* and *Usher* show that professional capacity may extend beyond a filing, hearing, or client communication when the lawyer's professional role supplies more than just the occasion for the conduct and instead gives it legal-system significance.

We find support for these principles in persuasive authority from the two jurisdictions with the closest textual equivalents to our rule. New Jersey's analogous rule includes commentary explaining that "professional capacity" covers not only "activities in the court house, such as a lawyer's treatment of court support staff, as well as conduct more directly related to litigation," but also "activities related to practice outside of the court house, whether or not related to litigation, such as treatment of other attorneys and their staff; bar association and similar activities; and activities in the lawyer's office and firm." N.J. RPC 8.4(g) cmt. Without a close relation to those examples, however, "purely private activities" are not covered. *Id.* Though we do not adopt this commentary, which is unique to New Jersey, its core distinction between practice-related conduct and purely private activity is useful.

Two decisions from Maryland are similarly instructive. In *Markey*, the court concluded that federal government lawyers acted in a professional capacity when they made statements manifesting bias or prejudice in an email chain with other employees. *Att'y Grievance Comm'n v. Markey*, 230 A.3d 942, 943–44, 957 (Md. 2020). Although the emails did not concern a specific case, the court found the professional-capacity element satisfied because the lawyers used official government email addresses, sent the "emails largely during work hours," aimed the comments at colleagues, and discussed the work of the office. *Id.* at 957 (citation modified). The

court reached the same conclusion in *Vasiliades*, where an attorney's social media posts, which were "replete with racial, homophobic, and sexist remarks," were interspersed with posts advertising "legal services and providing legal information." *Att'y Grievance Comm'n v. Vasiliades*, 257 A.3d 1061, 1084 (Md. 2021). These authorities reinforce that professional capacity turns on whether the challenged conduct has a substantial connection to the lawyer's professional role, assessed objectively and in context, not on any single fact viewed in isolation.

Taken together, our precedent and the persuasive authorities yield a workable standard. A lawyer acts "in a professional capacity" under Rule 8.4(g) when the challenged conduct, viewed objectively and in context, bears a substantial connection to the lawyer's practice of law or professional role in the legal system. That connection ordinarily exists when the lawyer performs, or purports to perform, a legal function—for example, representing a client, appearing in court, filing documents, negotiating, communicating as counsel, interacting with witnesses, supervising legal work, or exercising legal authority.

But the requisite connection may also exist when, although the lawyer is not performing a discrete legal task, the lawyer's professional role materially gives the challenged conduct its setting, audience, subject, or practical force. Under these circumstances, relevant considerations bearing on whether conduct occurred in a professional capacity include whether the conduct arose from an attorney-client relationship, a pending or prospective proceeding, a legal workplace relationship, or a relationship created by legal practice; whether the lawyer used professional letterhead, title, official legal resources, or a platform for providing legal services; whether the conduct was directed to or concerned legal actors or participants because of the lawyer's professional role; whether the conduct addressed the handling of cases, clients, victims, witnesses, litigants, or court operations; or whether the lawyer used professional authority to give the conduct practical force.

These principles have limits. Rule 8.4(g) is cabined by its text and constitutional constraints; it does not reach legitimate advocacy or purely private expression simply because the speaker is a lawyer. A lawyer

therefore does not necessarily act in a professional capacity merely because another lawyer is present; the statement is made in a courthouse, legal workplace, or bar event; or the lawyer holds a professional title or public legal office. Although those facts may bear on the inquiry, they ordinarily are insufficient, standing alone, to establish the required connection. At the same time, a private setting does not necessarily place conduct beyond the rule if the lawyer uses legal authority, communicates as counsel, discusses case-related matters, supervises legal work, or otherwise acts in a professional role. Ultimately, the dispositive question is whether the lawyer's challenged conduct, viewed objectively and in context, bears a substantial connection to legal work, legal institutions, legal actors, legal proceedings, or the exercise of professional authority.

We now apply this framework to several of Hardy's statements.

## B. The Commission proved by clear and convincing evidence that Hardy committed multiple violations of Rule 8.4(g).

Before applying the framework articulated above, we clarify the scope of our Rule 8.4(g) analysis. We consider only statements Hardy made as chief deputy prosecutor during the workday in 2023 that the Commission specifically alleged in its complaint and developed at the hearing. Those statements include Hardy's remarks about plea offers, upskirt photographs, women judges and women in the legal profession, people with autism or other disabilities, and Black people. We do not rely on the chief public defender's testimony about derogatory comments concerning Hispanic clients because he could not recall a specific remark. Nor do we decide whether Hardy's comments about Romani people, Native Americans, or a Burmese defendant—which the Commission did not specifically allege—independently violate Rule 8.4(g). Those remarks, however, remain relevant to the sanction because they are supported by credited testimony and relate to the alleged misconduct. *See, e.g.*, *In re Darling*, 685 N.E.2d 1066, 1068 (Ind. 1997) (per curiam). With the scope set, we turn to the statements on which our Rule 8.4(g) analysis rests.

We begin with Hardy's plea-offer comments, which bear the required substantial connection to his professional role. Judge Squiller and Casto both testified that Hardy said defendants with private counsel should receive more favorable plea proposals than defendants represented by public defenders. Casto also testified that Hardy said attractive women should receive better deals, though he perceived the remark as "fairly joking." These comments concerned how prosecutors should exercise discretion to resolve criminal cases—a core prosecutorial function. The workplace setting and professional audience reinforce that conclusion, but the substantial connection to Hardy's professional role arises principally from the comments' subject matter and his authority, as chief deputy prosecutor, to act on them.

The comments also manifested bias. The private-counsel remarks advocated differential treatment based on a defendant's ability to pay for counsel, placing them squarely within "socioeconomic status" under Rule 8.4(g). And even if Hardy delivered the attractive-women remark as a joke, Rule 8.4(g) asks whether the lawyer's words or conduct, objectively understood in context, manifested bias or prejudice. Under that standard, a chief deputy prosecutor's statement that attractive women should receive more favorable plea offers advocated differential treatment based on gender.

Hardy's upskirt-photograph remark likewise constitutes a Rule 8.4(g) violation. He told Casto that it would be a woman's fault if someone took an upskirt photograph of her. Viewed objectively and in context, this remark bore a substantial connection to Hardy's professional role because it concerned how prosecutors should view women who are victims of criminal conduct. And the remark manifested gender-based prejudice by suggesting that women who dress a certain way deserve to be victimized.

Hardy made other statements that violate Rule 8.4(g). They include his comments that no woman should be a judge, that women are "only marginally able to practice law," that people with autism or other disabilities should be "put down" or "drowned in the river," and that Black people had gone "downhill" and would fare better if they learned to "speak properly" or "more like White people."

Each of these statements satisfies the professional-capacity element. Though they were not tied to a discrete legal task, they were not purely private exchanges either. Hardy made them as chief deputy prosecutor, and they concerned the competence of legal actors, the treatment of people who appear in the justice system, and the exercise of prosecutorial judgment by a senior prosecutor whose office decided whether to charge cases and how to negotiate and try them. He also made these comments within ordinary courthouse and prosecutor-office relationships, including to judges and the deputy prosecutor whom he supervised. Viewed objectively and in context, those circumstances collectively establish the required substantial connection: Hardy's position as chief deputy prosecutor materially gave these remarks their professional setting, audience, subject, and practical force.

And these remarks manifested bias or prejudice. Statements that no woman should sit on the bench, that women are only marginally able to practice law, that people with autism or other disabilities should be killed, and that Black people had "gone downhill" and needed to "speak properly" are not neutral observations or abstract provocations. They are negative judgments about people based on gender, disability, or race.

Hardy, however, characterizes his statements about Black people as reflecting only a concern that anyone who speaks differently from most people in DeKalb County may not receive a fair hearing before a jury. To be sure, lawyers may discuss juror perceptions, implicit bias, and barriers to a fair trial; legitimate advocacy may require such discussions. But the credited testimony does not support Hardy's characterization. Casto testified that Hardy said Black people were not doing well in society "because they did not speak properly" and would be better off "if they spoke more like White people." Those statements are not neutral observations about juror perceptions or trial fairness; they manifest race-based prejudice by stereotyping and denigrating Black people as linguistically and socially inferior to White people.

Having concluded that Hardy committed multiple violations of Rule 8.4(g), we emphasize two limits. Hardy is not being disciplined for holding private views, participating in public debate, or engaging in

legitimate advocacy. Nor are we concluding that every offensive statement made by a lawyer subjects them to professional discipline. As explained above, Rule 8.4(g) does not reach a lawyer's personal views, political speech, or public commentary solely because others find the expression offensive or disagreeable. Today's holding instead rests on statements manifesting bias or prejudice that the evidence shows Hardy made while acting in a professional capacity. It is well settled that lawyers, as officers of the legal system, may be subject to professional discipline for speech that violates duties attached to the practice of law. *See, e.g.*, *Gentile*, 501 U.S. at 1071; Rebecca Aviel, *Rule 8.4(g) and The First Amendment: Distinguishing Between Discrimination and Free Speech*, 31 Geo. J. Legal Ethics 31, 74 (2018) (citing several examples in concluding that "[i]t is neither unprecedented nor particularly troubling for the bar to regulate conduct 'related' or 'connected' to the practice of law"). And here, just as in *Dempsey*, the violations we have found are not "based on any communication that falls within [Hardy's] broad constitutional right to freedom of speech and expression." 986 N.E.2d at 817.

Our holding therefore does not transform this Court into a general monitor of lawyer speech. Purely private speech remains outside Rule 8.4(g), and legitimate advocacy is expressly protected. But when a lawyer engages in biased or prejudicial conduct that bears a substantial connection to legal work, legal institutions, legal actors, legal proceedings, or the exercise of professional authority, the rule applies. And when, as here, that lawyer is a prosecutor, the risk to public confidence is especially acute because they have "the capacity to bolster or damage public esteem for the system different than that of attorneys otherwise in practice." *Hill*, 144 N.E.3d at 193 (quoting *Oliver*, 493 N.E.2d at 1242).

In sum, we hold that the Commission proved by clear and convincing evidence that Hardy committed multiple violations of Rule 8.4(g) by making statements, while acting in a professional capacity, that manifested bias or prejudice based on race, gender, disability, or socioeconomic status. We next determine the appropriate sanction for those violations and his violations of Rules 4.4(a) and 8.2(a).

## II. Hardy's misconduct warrants a 180-day suspension with automatic reinstatement.

In determining the appropriate sanction, we consider the nature of the lawyer's misconduct, the harm to the public and the profession, our duty to preserve the profession's integrity, the risk to the public in allowing the attorney to continue practicing, and any aggravating or mitigating circumstances. *See, e.g.*, *In re Ryan*, 824 N.E.2d 687, 689 (Ind. 2005) (per curiam). Our professional conduct rules likewise recognize that a sanction's severity depends "on all the circumstances, such as the willfulness and seriousness of the violation, extenuating factors and whether there have been previous violations." Prof. Cond. R., Scope.

Fortunately, our disciplinary precedent has seldom addressed misconduct of this magnitude: a chief deputy prosecutor who, in conversations with judges, colleagues, subordinate prosecutors, and a witness, repeatedly made statements manifesting bias or prejudice, falsely accused a judge of bias, and falsely accused that judge and a local attorney of having an inappropriate sexual relationship. This case does not involve a single offensive remark or an isolated lapse in judgment; it reflects a disturbing pattern.

That pattern matters. Lawyers are officers of the legal system and public citizens with a "special responsibility for the quality of justice." Prof. Cond. R., Preamble. They "should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers, and public officials." *Id.* And they should promote public confidence in the rule of law and the justice system. *Id.* Far from demonstrating respect for the legal system and those who serve it, Hardy's conduct eroded public confidence in the system's fairness and integrity.

His multiple, wide-ranging Rule 8.4(g) violations occurred during the workday in settings where lawyers and judges were carrying out the work of the legal system. We have long recognized the seriousness of a lawyer manifesting bias or prejudice when acting in a professional capacity. In *Thomsen*, we explained that such misconduct "cannot be taken lightly" because racist comments "only serve to fester wounds caused by past

discrimination and encourage future intolerance." 837 N.E.2d at 1012. We repeated that admonition in *McCarthy*, 938 N.E.2d at 698. And it applies here. Hardy's biased and prejudicial statements based on gender, race, disability, and socioeconomic status, which "only serve to fester wounds caused by past discrimination and encourage future intolerance," have no place in our profession.

Hardy's separate violations of Rules 4.4(a) and 8.2(a) compounded the harm. His false accusations about Hamilton and Judge Squiller damaged reputations, disrupted the local courts, and led to the dismissal of a criminal case. And the broader course of conduct established at the hearing—including derogatory and dehumanizing remarks about Romani people, Native Americans, low-income individuals, women seeking child support, and a Burmese defendant—confirms that Hardy's misconduct was pervasive.

A few considerations weigh in mitigation. Hardy has no prior disciplinary history. The hearing officer also observed that Hardy may have certain personality traits contributing to his "unfiltered, insensitive, and boorish opinions." But the record contains no medical diagnosis or expert evidence establishing a mitigating condition. In any event, those observations would not excuse the misconduct or alleviate our concern that Hardy has shown little, if any, insight into its seriousness. He continues to deny making nearly every statement attributed to him despite the credited testimony of the Commission's witnesses and testimony from one of his own witnesses confirming that he had made similar comments about people with autism. And when he has acknowledged certain conversations, he has minimized the remarks as jokes, provocations, or misunderstandings.

Our prior cases involving Rule 8.4(g) provide useful reference points for determining the appropriate sanction. Isolated violations have resulted in public reprimands or short suspensions. *See Thomsen*, 837 N.E.2d at 1012; *Campiti*, 937 N.E.2d at 340; *Kelley*, 925 N.E.2d at 1279; *McCarthy*, 938 N.E.2d at 699; *Barker*, 993 N.E.2d at 1139. More egregious misconduct, combined with other serious violations, has produced substantial suspensions without automatic reinstatement. *See Epstein*, 87 N.E.3d at 471

(ninety-day suspension without automatic reinstatement); *Dempsey*, 986 N.E.2d at 817 (three-year suspension without automatic reinstatement); *Usher*, 987 N.E.2d at 1090 (three-year suspension without automatic reinstatement).

Hardy's case lies between those poles. His Rule 8.4(g) misconduct is far more extensive and corrosive than the isolated remarks in *McCarthy* or *Barker*, and it is accompanied by proven violations of Rules 4.4(a) and 8.2(a). Yet his misconduct, while egregious, did not involve the sustained dishonesty and abuse of legal process present in *Usher* or *Dempsey*.

The hearing officer recommended a suspension of at least thirty days with automatic reinstatement, and the Commission requests a sixty-day suspension. Neither sanction adequately reflects the seriousness of Hardy's misconduct, the public role he occupied, the concrete harm he caused, or his lack of meaningful insight. A more substantial suspension is necessary to vindicate the profession's standards, deter similar misconduct, and underscore the gravity of his professional obligations.

We therefore conclude that a suspension of 180 days with automatic reinstatement is appropriate. This sanction reflects the seriousness of Hardy's repeated statements manifesting bias or prejudice; his misuse of his prosecutorial role; the harm he caused to lawyers, judges, and litigants; the resulting damage to public confidence; and the need to protect the fairness and integrity of Indiana's legal system.

## Conclusion

The Commission proved by clear and convincing evidence that Hardy violated Rule 8.4(g), and our de novo review confirms the hearing officer's conclusions that he also violated Rules 4.4(a) and 8.2(a). For this professional misconduct, we suspend Hardy from the practice of law in Indiana for a period of 180 days, beginning August 4, 2026.

Hardy shall not undertake any new legal matters between service of this opinion and the effective date of the suspension. During that period, he shall fulfill the duties of a suspended attorney under Admission and

Discipline Rule 23(26). At the conclusion of the suspension period, provided there are no other suspensions then in effect, Hardy shall be automatically reinstated to the practice of law, subject to the conditions of Admission and Discipline Rule 23(18)(a). The costs of these proceedings are assessed against Hardy, and the hearing officer appointed in this case is discharged with the Court's appreciation.

Massa, Slaughter, and Molter, JJ., concur.
Goff, J., concurs in part and dissents in part, believing the 180-day suspension should be imposed without automatic reinstatement.

ATTORNEYS FOR RESPONDENT
Dina M. Cox
J. Neal Bowling
Janelle P. Kilies
Lewis Wagner & Trimble
Indianapolis, Indiana

ATTORNEYS FOR INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
Adrienne L. Meiring, Executive Director
Stephanie Bibbs, Deputy Director of Litigation
Angie L. Ordway, Staff Attorney
Indianapolis, Indiana